CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

APR 0 6 2016

JULIA C. DUDLEY, CLERK
BY: HMcDana.co
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

ROGER G. HORTON, JR.,　　　　　)
　　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　)　　Civil Action No. 4:15-cv-00008
v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)　　**MEMORANDUM OPINION**
COMMISSIONER OF　　　　　　　　)
SOCIAL SECURITY,　　　　　　　　)　　By:　　Joel C. Hoppe
　　　　　Defendant.　　　　　　　)　　United States Magistrate Judge

Plaintiff Roger G. Horton, Jr., asks this Court to review the Commissioner of Social

Security's ("Commissioner") final decision denying his application for disability insurance

benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. The case is

before me by the parties' consent under 28 U.S.C. § 636(c)(1). ECF No. 7. Having considered

the administrative record, the parties' briefs and oral arguments, and the applicable law, I find

that substantial evidence supports the Commissioner's decision that Horton is not disabled.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court

asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700,

704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is

1

"more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work *See* 20 C.F.R. § 404.1520(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Horton filed an application for DIB on July 12, 2011, alleging disability caused by arthritis, back and hip pain, and diabetes. Administrative Record ("R.") 67. He claimed that his period of disability began on June 13, 2011, at which time he was 49 years old. *Id.* Disability Determination Services ("DDS"), the state agency, denied his claim at the initial and reconsideration stages. R. 67–80, 82–96. On September 3, 2013, Horton appeared with counsel at an administrative hearing before ALJ Brian Rippel. R. 29–63. The ALJ heard testimony from Horton, R. 44–54; his mother, Shirley Horton, R. 35–41; and Andrew Beal, a vocational expert ("VE"), R. 54–62.

ALJ Rippel denied Horton's claim in a written decision issued on September 10, 2013. R. 11–24. He found that Horton had severe impairments of degenerative disc disease, left hand contractures, obesity, affective disorder, substance abuse disorder, attention deficit disorder, and somatoform disorder, but also found that Horton's impairments of diabetes mellitus and hypertension were nonsevere. R. 13–14. The ALJ then determined that none of Horton's severe impairments, alone or in combination, met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1—in particular Listings 1.04 (disorders of the spine), 12.02 (organic mental disorders), 12.04 (affective disorders), 12.07 (somatoform disorders), and 12.09 (substance addiction disorders). R. 14–16.

As to Horton's residual functional capacity ("RFC"),[1] the ALJ determined that Horton could perform light work,[2] with some postural and environmental limitations, and was "limited

---

[1] A claimant's RFC is the most he or she can do on a regular and continuing basis despite his or her impairments. 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

[2] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. § 404.1567(b). A person who can meet these lifting

to work that involves simple, routine, and repetitive tasks, [such as] entry level unskilled work." R. 16–23. Based on this finding and the testimony of the VE, the ALJ concluded that Horton was unable to perform any of his past relevant work, but could perform other jobs existing in the national economy, including packer, cleaner, and cafeteria attendant. R. 22–24. Therefore, the ALJ concluded that Horton was not disabled. R. 24. The Appeals Council received additional evidence into the record, R. 5, but ultimately declined Horton's request for review, R. 1–3. This appeal followed.

III. Facts

*A.    Relevant Treatment Records*

Medical evidence in the record before ALJ Rippel shows that from 2004 to 2008, Horton received occasional treatment from Bozenna Liszka, M.D., at Martinsville Family Medical Center, for a variety of medical conditions and symptoms, including diabetes, hepatitis C, anxiety, hypertension, sinus and mouth infection, and upper respiratory illness. R. 295–340. On a few occasions, Horton also reported pain in his finger joints, knees, ankles, right leg, and lower back. R. 311, 333. In April 2008, Andrew Gehrken, M.D., at Piedmont Urology Associates, evaluated Horton for nocturia, which was described as intermittent and mild in intensity. Dr. Gehrken noted that Horton also complained of joint pain from arthritis, lower back pain, and diabetes. R. 365–67.

Beginning in October 2008, Horton received treatment from Maureen Aaron, M.D. R. 239–63. Prior to the alleged onset date, Dr. Aaron noted that Horton performed heavy work, R. 241, and that he had back pain caused by lifting at work, R. 242. Horton took hydrocodone for

---

requirements can perform light work only if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

his back pain and arthritis. R. 250, 254. Dr. Aaron observed that Horton was sometimes noncompliant in performing finger sticks, taking medication, and following medical recommendations as to diet and alcohol and tobacco use. R. 241, 244–45, 249, 258.

Horton's visits with Dr. Aaron prior to the alleged onset date were infrequent. There is no evidence of any treatment between February 2010, R. 239–41, and November 2010, R. 258–62; the record is silent again between December 2010, R. 256–57, and June 2011, when Horton reported a skin condition on his right arm that was subsequently diagnosed as dermatophytosis, R. 255, 343. After being treated for this condition, Horton was cleared to return to work on June 13, 2011—his alleged onset date. R. 264. After the alleged onset date, Horton did not receive treatment again until May 7, 2012, when he reported back to Dr. Aaron. She stated that Horton's health was poor because of his lifestyle, including his smoking and past alcohol use, and that he still did not check his finger sticks. Horton reported chronic back pain and parasthesias down his legs, and he complained that he had difficulty sleeping through the night. R. 291.

On July 5, 2012, Horton went to James Kramer, M.D., with Murphy/Wainer Orthopedic Specialists, for an initial evaluation regarding the pain in his lower back and left hand. Horton reported that he injured his back at work during the early 1980s and had suffered from chronic intermittent, but persistent, pain since that time. He stated that he had been told at one point that he had arthritis in his spine. Examination of the lumbar spine showed mildly diminished forward bending by 10–15% with pain, mildly diminished extension with pain, normal side bending, no midline tenderness, and mild diffuse paralumbar or quadratus spasm with no SI dysfunction. There was no pelvic obliquity and each hip was unremarkable. Straight leg raise tests were negative bilaterally. Imaging showed markedly diminished disc space height at L5-S1. Dr. Kramer diagnosed degenerative disc disorder at L5-S1 with chronic mechanical low back pain.

He told Horton that this would cause long-term symptoms with a lifting disability and a certain amount of chronic pain, and he opined that the only definitive solution would be a lumbar fusion. R. 292.

Horton also explained to Dr. Kramer that he injured his left hand in a separate workplace accident and had since suffered from significant and worsening pain and stiffness in that hand, particularly in the ring finger and little finger. Examination of the left hand showed evidence of a Dupuytren contracture with tenderness to palpation and noticeable flexor tenosynovial thickening to the fourth and fifth digit. The fifth digit was fixed at the PIP joint and had 45 degrees of movement at the MCP joint. The fourth digit was fixed 15 degrees at the PIP joint. Phalen's and Tinel's signs were negative. Imaging showed no underlying bony abnormalities. Dr. Kramer could not offer much to Horton with regard to his hand condition. He recommended that Horton consider hand surgery consultation if he wanted to proceed with further proactive therapeutic intervention. *Id.*

Horton returned to Dr. Aaron on July 31 with continued complaints of back pain radiating down his legs. He reported getting some help from a back brace, but claimed that it had been stolen and he had not gotten another one. Horton stated that he could not do much at home, although at times he could help in the yard for a short while. He also told Dr. Aaron that Dr. Kramer had told him his disc was "shot." R. 289. On November 1, 2012, Horton was examined by John Favero, D.O. Dr. Favero noted that Horton complied with his medication for cholesterol and anxiety and that he checked his blood sugar daily. He characterized Horton's anxiety symptoms as mild and his mood status as controlled. Dr. Favero also observed that Horton's back pain was moderate, controlled, aggravated by movement, and alleviated by Lortab. Horton expressed that he was not interested in weaning off of narcotics. Physical examination findings

were unremarkable. Dr. Favero counseled Horton on diet and exercise and advised him to return as needed or in three to four months. R. 344–46.

Horton returned to Dr. Favero on February 27, 2013. The report from this visit addresses Horton's hypertension, high cholesterol, and diabetes, as well as a rash on his right forearm, but says nothing with regard to Horton's chronic pain symptoms or anxiety. Physical examination was unremarkable aside from the rash on Horton's forearm. Horton acknowledged smoking and drinking fourteen to twenty alcoholic drinks per week. R. 351–56. Horton's next visit with Dr. Favero was on April 26. Dr. Favero noted that Horton's back pain was stable, moderate in intensity, and aggravated by movement. Horton continued to claim that he benefited from narcotic medications and did not wish to be weaned off of them. Findings on physical examination were again unremarkable. R. 357–60. Imaging of Horton's hand conducted on May 1, 2013, showed no abnormalities. R. 362.

B.    *Opinion Evidence*

  1.    *Consulting Examiners*

    a.    *Dr. Storch*

The record includes medical opinions[3] from two consulting examiners for the Virginia Department of Rehabilitative Services. The first is from Emilie Storch, Ph.D., who conducted a mental status evaluation on September 20, 2011. Horton and his mother told Dr. Storch that Horton had congenital arthritis in his fingers, lower back, knees, and ankles that initially manifested when Horton was sixteen to eighteen years old. They informed Dr. Storch that

---

[3] "Medical opinions are statements from . . . acceptable medical sources that reflect judgments about the nature and severity of [the applicant's] impairment(s)," including: (1) the applicant's symptoms, diagnosis, and prognosis; (2) what the applicant can still do despite his or her impairment(s); and (3) the applicant's physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2).

Horton had worked in construction for approximately twenty years and most recently had worked at Wal-Mart. Horton stated that he had difficulty standing up on concrete floors and would have to lean against the wall while standing. He also claimed that he sometimes, but not always, felt better after moving around. Horton's mother stated that there were days when Horton was simply unable to go to work. R. 265–66.

Horton stated that after a work accident in 1984, his back "popped out" and he ruptured a disc. His left hand was injured in another work accident around 2001. He informed Dr. Storch that he never underwent surgery for his back or visited the hospital for treatment of his hand. In addition, Horton also claimed to suffer from pinched nerves that caused pain throughout his body. His mother opined that Horton's pain caused difficulty in his interpersonal relationships and contributed to his short temper and limited learning ability. Horton also informed Dr. Storch about his diabetes, high blood pressure, and past alcohol abuse. He claimed to have been hospitalized for three or four car accidents and to have been in about thirty total accidents as a result of his drinking problem. R. 266–67.

Regarding his daily activities, Horton informed Dr. Storch that he had been out of work for the previous three months. He did chores at home and helped his father with some electrical work. R. 269. Horton's mother stated that he needed quite a bit of help performing his chores and that she helped him pay bills because he cannot keep figures straight. Horton's mother informed Dr. Storch that Horton went to social groups and cookouts, but did not drive. She also stated that Horton had been fired from previous jobs for insubordination and failure to follow instructions and that he had difficulty dealing with stress. R. 267–68. Dr. Storch noted that when hunting, Horton used his left hand to shoot rifles and a shotgun and his right hand to shoot pistols and throw knives. R. 270. On a typical day, Horton claimed that he would wake up around 9:00 a.m.,

drink a cup of coffee, eat breakfast, take care of his hygiene, watch TV, and do occasional chores. R. 271.

Dr. Storch observed that Horton appeared to be easily distracted throughout the examination. She found that he was oriented to person and place, but not to date. R. 270. He was asked questions to assess his memory and was unable to come up with a correct response to some of them. Dr. Storch noted that his thought content and process were simplistic and slow and his perception was somewhat skewed. Horton had relatively good social judgment, and his fund of knowledge was mediocre. He evidenced a stream of thought that was logical, but very unorganized. R. 271. On the Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV") evaluation, Horton scored at 78 for verbal comprehension, 81 for perceptual reasoning, 83 for working memory, and 65 for processing speed. Dr. Storch did not report a WAIS-IV full scale score, but found that Horton's other scores placed him in the borderline range of intellectual functioning. R. 272–73.

Dr. Storch diagnosed Horton with Bipolar Illness, Attention Deficit Hyperactivity Disorder-Combined Type, Alcohol Abuse (past), Substance Related Disorder, Pain Disorder with both Psychological Factors and a General Medical Condition, and Borderline Intellectual Functioning. She assessed a Global Assessment of Functioning ("GAF")[4] score of 51.[5] R. 274–75. Dr. Storch opined that Horton had "a poor ability to function in an appropriate level of occupational adjustment" because of his borderline intellectual functioning and uneven moods.

_____

[4] GAF scores represent a "clinician's judgment of the individual's overall level of functioning." Am. Psychological Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. 2000) ("*DSM-IV*"). The scale is divided into ten ten-point ranges reflecting different levels of functioning, with 1–10 being the lowest and 91–100 the highest. *Id.*

[5] A GAF score of 51–60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* at 34.

R. 275. She also opined that "[t]he prognosis for occupational functioning is very poor" and that

Horton

> is in such physical pain . . . that he would be unlikely to maintain regular attendance in the workplace or perform work activities on a consistent basis. He may or may not deal with supervision well given his past history of insubordination. It is unlikely that he would complete a normal workday or workweek without interruptions from his physical condition. He likely would interact well with coworkers and with the public because he enjoys talking to people. He does not deal with stress well so this would be unlikely for him to cope with in the workplace.

R. 276.

### b.    Dr. Bahhur

The record also includes a consultant report from Thabit Bahhur, M.D., who evaluated Horton's physical condition on October 17, 2011. Horton told Dr. Bahhur that he had problems with his left hand, intermittent pain in his lower back, and numbness in his legs bilaterally. Horton claimed he had been in thirteen motor vehicle accidents and three motorcycle accidents, which contributed to his problems. He told Dr. Bahhur that he worked at Nationwide Homes until he was fired and then worked at Wal-Mart for five and a half years before being fired for taking a broom off the shelf to use for cleaning. Horton said that he had difficulty using his left hand because of stiffness, and he claimed that because of his back pain he could not sit long and needed to shift his weight from one side to the other. R. 278–79.

Findings on physical examination were mostly unremarkable. Dr. Bahhur observed that Horton had contractures of the left-hand fifth and fourth finger which were not extreme but slight, with restricted range of motion in those fingers. Horton exhibited tenderness to palpation of the lumbosacral spine area, but had normal range of motion on extension and flexion, as well as bilateral lateral flexion. He could stand appropriately in the normal stance position and ambulated within the normal capacity. His muscle tone, strength, and deep tendon reflexes were

normal. Range of motion in Horton's extremities and spine was mostly normal. Dr. Bahhur noted

that Horton's hypertension, hyperlipidemia, and diabetes were being addressed effectively and

did not appear to present a problem for disability. R. 280–81, 285. Imaging of Horton's lumbar

back showed marked degenerative disc disease at the L5-S1 level with marked disc space

narrowing and a vacuum phenomenon, as well as mild scoliosis of the lumbar spine. R. 283.

With regard to Horton's back pain, Dr. Bahhur opined that he had some discomfort to his

back going into his legs, with mild reproduction of discomfort on palpation and range of motion,

but did not appear to be limited. Dr. Bahhur did not expect Horton's back issues to produce any

major disabling effects, except he would be limited from doing excessive bending, excessive

walking, or climbing up ladders or heights. He also opined that Horton may have some limited

use of his fourth and fifth fingers on his left hand because of contractures, but had normal

mobility, fine motor capabilities, and gross motor capabilities in the other digits. He expressed

that Horton could manage a full eight-hour workday with the usual breaks and minor restrictions,

and noted that Horton had already been doing this until he was fired three months prior. R. 281–

82.

2.    *DDS Opinions*

On November 14, 2011, Robert Keeley, M.C., reviewed Horton's medical record as part

of DDS's initial disability determination and made a physical RFC assessment. He noted that

Horton had marked degenerative disc disease at L5-S1, with normal range of motion and

activities of daily living that were not severely limited. He found that Horton could lift and/or

carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours in

an eight-hour workday; sit for six hours in an eight-hour workday; occasionally climb ramps or

stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, or crouch; and

never crawl. He also found that Horton did not have manipulative limitations or environmental limitations, except that he should avoid concentrated exposure to hazards. R. 74–76. On reconsideration, Richard Surrusco, M.D., affirmed this RFC determination, but added that Horton should avoid concentrated exposure to vibration. R. 90–91.

On November 29, 2011, Jeanne Buyck, Ph.D., reviewed Horton's medical record for initial disability determination. She noted that the record indicated that Horton had borderline intellectual functioning and trouble staying focused. She found that Horton was moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and work in coordination with or in proximity to others without being distracted by them. Although Horton had some mild to moderate limitations, Dr. Buyck determined that he was still capable of performing simple, unskilled work. R. 76–78. On reconsideration, Howard Leizer, Ph.D., affirmed this RFC determination. R. 92–93.

### 3. *Treating Sources*

On August 9, 2012, Dr. Aaron sent a letter to Horton's attorney that expressed her opinion of Horton's medical condition. She noted that Horton's diabetes was poorly controlled and contributed to his obesity and hypertension. She stated that medication compliance was an issue and that Horton smoked heavily, drank alcohol, and had anxiety problems. Dr. Aaron further noted that Horton had worked in heavy construction for years after injuring his back and that even his most recent job at Wal-Mart involved heavy lifting and bending. She stated that Horton had not had back surgery and that he had difficulty getting comfortable because of his back pain. She also stated that Dr. Kramer had told Horton that his discs were shot. Dr. Aaron opined that Horton probably could not be gainfully employed for the kind of manual work he

normally performed. She further stated that Horton had been unable to work for the past year and could be considered disabled indefinitely. R. 287–88.

Dr. Kramer provided an opinion letter on September 7, 2012. He noted that Horton suffered from two orthopedic conditions: chronic low back pain secondary to degenerative disc disease at L5-S1 and posttraumatic Dupuytren's contracture involving the left hand. Dr. Kramer opined that although these conditions limited Horton's employment options, they were not completely disabling. He stated that a lumbar fusion was a definitive solution to Horton's back problem and opined that this would preclude him from heavy manual labor, heavy lifting, and repetitive twisting, but would not preclude Horton from performing clerical work, desk work, or light manual labor. Dr. Kramer also stated that Horton's left hand contractures would cause a certain amount of functional disability with gripping and holding objects, but noted that Horton had no restrictions with the use of his right upper extremity. R. 293.

Dr. Favero issued an opinion letter on August 13, 2013. He stated that Horton's back pain was initially caused by a motorcycle accident that occurred when he was a teenager and was aggravated by subsequent injuries. He noted that Horton's back pain required treatment with narcotics and precluded him from doing past work in construction or as a mechanic because it limited his ability to stand for long periods of time, bend over, or lift heavy objects. He also stated that Horton's hand injury made once easy tasks more difficult and that Horton's diabetes was difficult to control because he was unable to exercise secondary to his chronic back pain. Dr. Kramer opined that Horton would have difficulty working at that time or in the future. R. 364.

C. *Horton's Submissions and Testimony*

On July 26, 2011, and again on February 6, 2012, Horton (with assistance from his mother) completed function report forms that he submitted to DDS. R. 184–91, 206–14. He

explained that he lived in the basement of his parents' house. R. 184, 206. He described spending most of the day watching television, although he also stated that he tidied up inside the house and helped take care of the family's dogs by taking them on short walks, playing by tossing a ball or Frisbee, and combing or brushing them. 184–85, 206–07. Horton stated that he could take care of his personal needs without assistance, R. 185, 207, but needed to be reminded to take his medication, R. 186. Horton's mother prepared most meals, although Horton could prepare occasional snacks and simple meals. He also helped with cleaning, laundry, and dishes, and could use a riding mower. R. 186, 208. Horton stated that he went outside every day and could walk short distances or ride in a car, but could not drive because of difficulty passing the written driver's test. He went shopping infrequently and required assistance with paying bills and handling a savings account. R. 187, 209. Horton stated that he socialized and attended cookouts with friends or went to the bar occasionally. R. 188, 210. He stated that he could walk a quarter or half mile before needing to stop and rest, had difficulty with paying attention and following directions, and felt irritable because of his pain. R. 189–90, 211–12.

At the hearing before the ALJ, Horton's mother testified that her son's physical condition had gotten much worse since he last worked at Wal-Mart in June 2011. R. 35. She stated that on an average day, Horton would wake up and eat breakfast with his family and then rest before taking his insulin shots. She claimed that before his condition worsened, Horton could help with chores around the house and assist his father with electrical work, but now could no longer take part in these activities. R. 37–38. She stated that Horton suffered from anxiety because he was unable to help his parents at home. R. 39. She described Horton's posture as "[s]quirming," and stated that while seated he needed to shift from one hip to another or lean on his elbows in order

to take the weight off his back. R. 37. She also testified that Horton had been fired from his job at Wal-Mart for disobeying a supervisor, struggled in school, and had low intelligence. R. 40–41.

Horton testified to the ALJ that he was 6'2" tall, weighed 265 pounds, and was right-handed. He stated that he dropped out of school after completing the eleventh grade, had never gotten his GED, and could do some addition, subtraction, reading, and writing. Horton told the ALJ that he lost his driver's license following a DUI and since that time he drank beer only two or three times per week with meals. R. 44–46. He discussed his last job at Wal-Mart, explaining that his back pain made it difficult to carry heavy items, stoop, bend over, or walk on concrete. Horton claimed that these issues required him to take frequent breaks. He also stated that he needed to wear gloves while moving boxes because of his injured left hand. Horton claimed that these problems had worsened over the last year of his employment to the point that he would not have been able to continue working even had he not been fired over a separate incident. R. 46–49. He stated that he could stand for five to ten minutes before needing to rest, could sit in one position for approximately ten minutes before becoming uncomfortable, and could not stoop or bend over without his back going out. R. 51–52.

D.    *Additional Evidence*

After the ALJ determined that Horton was not entitled to benefits, Horton submitted additional evidence to the Appeals Council for consideration, including affidavits from Horton, his mother, and his father.[6] R. 233–38. These affidavits challenge facts that were previously established in the record and included in the ALJ's decision. Specifically, the affidavits state that (1) the ALJ incorrectly found, based on Horton's function report forms, that he independently cared for his pets, R. 233, 235, 238; (2) Dr. Storch's report, which stated that Horton used both

---

[6] The assertions made in all three affidavits are the same in all material respects. R. 233–38.

his right and left hands while hunting, was based on outdated information and could not be relied

upon by the ALJ, R. 233, 235, 237–38; and (3) Horton could no longer perform light chores

around the house, despite claims in the function report forms that he occasionally did these tasks,

R. 233–34, 236, 237. The affidavits claim that since the time these statements were originally

made, Horton's back pain, hand injury, and arthritis had worsened to the point that he could no

longer do any of these activities. R. 233–38.

Horton also submitted a diagnostic assessment completed by Bobbie Jo Seamster, L.P.C.,

with Healing Minds Therapy, on October 17, 2013. R. 368–73. Ms. Seamster diagnosed Horton

with Bipolar Disorder, Alcohol Abuse, and Borderline Intellectual Functioning (per Horton's

medical history), and assessed a GAF of 48.[7] R. 371. Based upon Horton's medical history and

reports given by Horton and his parents (who also attended the appointment), Ms. Seamster

provided the following assessment:

> Roger Horton has reported his inability to maintain employment in the past and
> present time due to physical and mental disabilities. Currently and most notably in
> the last 5–6 years, Mr. Horton's physical health has reportedly declined and
> worsened to the extent that he is unable to drive, walk or stand longer than 10
> minute increments and is unable to lift, carry, or grasp items required for all
> employment. He is unable to live alone, due to mental and physical health, and
> relies solely on his parents for food, clothing, shelter, and physical care. He has no
> income of his own and is also unable to manage his finances due to mental and
> learning disabilities. Professionally, it is of my clinical opinion, based on the
> information provided by the client and family during this assessment, that Mr.
> Horton is disabled from any type of gainful employment at this time, due to the
> numerous physical and mental impairments, which are estimated to last for more
> than 1 year. This disability certainly has existed since mid-2011 and probably
> prior to that date.

R. 373.

---

[7] A GAF score of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or
school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* at 34.

IV. Discussion

Horton argues that the ALJ's RFC determination is not supported by substantial evidence. Specifically he alleges the ALJ erred by disregarding or improperly discrediting the witness testimony and portions of the medical opinion evidence. Pl. Br. 3–8, 10–11, ECF No. 13. In addition, Horton argues that the newly submitted evidence undermines the RFC determination and seeks reversal or remand for a new hearing. Pl. Br. 8–12.

A.    *Witness Testimony*

Horton argues that the testimony he and his mother gave before the ALJ supports a finding that he is not capable of doing light work and therefore is disabled. He points to his own statements that he needed to take additional breaks while working at Wal-Mart because of his back pain and low blood sugar, that he can only stand for five to ten minutes at a time and sit for approximately ten minutes before needing to change his position, that he cannot stoop or bend at all, and that he cannot help at all around the house. Pl. Br. 3–4. With regard to his mother's testimony, Horton points to her statements that he cannot do anything around the house and that he constantly shifts his weight or props up on his elbows while seated because of his back pain. Pl. Br. 4–5. He argues that these statements prove that his symptoms are so limiting that he cannot perform light work.

The regulations set out a two-step process for evaluating a claimant's allegation that he is disabled by symptoms, such as pain, caused by a medically determinable impairment. *Fisher v. Barnhart,* 181 F. App'x 359, 363 (4th Cir. 2006) (citing 20 C.F.R. § 404.1529). The ALJ must first determine whether objective medical evidence[8] shows that the claimant has a medically

---

[8] Objective medical evidence is any "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of

determinable impairment that could reasonably be expected to cause the kind and degree of pain alleged. 20 C.F.R. § 404.1529(a); *see also Craig,* 76 F.3d at 594. If the claimant clears this threshold, then the ALJ must evaluate the intensity and persistence of the claimant's pain to determine the extent to which it affects his physical or mental ability to work. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *see also Craig,* 76 F.3d at 595.

The latter analysis often requires the ALJ to determine "the degree to which the [claimant's] statements can be believed and accepted as true." SSR 96-7p at *2, *4. The ALJ cannot reject the claimant's subjective description of his pain "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. § 404.1529(c)(2). A claimant's allegations of pain "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers." *Craig*, 76 F.3d at 595.

Here, the ALJ considered Horton's testimony, but found that it was not fully credible as to the intensity, persistence, and limiting effects of his symptoms. R. 16–17. He noted that Horton's treatment had been generally routine and conservative, as he had declined the lumbar fusion suggested by Dr. Kramer and no other surgical intervention had been recommended. The ALJ observed that there was no record of ongoing treatment by an orthopedist, neurologist, or other specialist. He explained that an X-ray of the lumbar spine showing some degenerative disc disease was the only objective support for an impairment that could reasonably be expected to produce symptoms of the intensity expressed by Horton. The ALJ pointed to Dr. Bahhur's opinion that Horton could complete a full eight-hour workday with some restrictions, and he

medically acceptable diagnostic techniques." 20 C.F.R. § 404.1528(b)–(c). "Symptoms" are the claimant's description of his or her impairment. *Id.* § 404.1528(a).

observed that Horton's own statements as to his activities of daily living supported a conclusion

that he was not fully disabled. He noted that Horton claimed that he independently cared for his

personal needs, performed some chores around the house, took care of his pets, used both of his

hands while hunting, went outside daily, and socialized with friends. R. 21. The ALJ also

considered the testimony given by Horton's mother, and found that it was based on casual

observation and loyalties of family, and therefore did not outweigh the accumulated medical

evidence. R. 22.

A reviewing court will defer to the ALJ's credibility determination except in "exceptional

circumstances." *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing

*Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)). "Exceptional circumstances include

cases where a credibility determination is unreasonable, contradicts other findings of fact, or is

based on an inadequate reason or no reason at all." *Edelco*, 132 F.3d at 1011. Here, the ALJ

provided adequate reasons for for discrediting the testimony of Horton and his mother.

Furthermore, the ALJ reasonably determined that Horton's treatment record and activities of

daily living conflicted with his claims of limitations. Acordingly, I will not disturb the ALJ's

credibility determination.

B.    *Medical Opinions*

Horton argues that the ALJ failed to give proper weight to the opinions of Dr. Storch and

Dr. Favero, which he claims support a finding that he is disabled. In his decision, the ALJ gave

less weight to each of these opinions than he gave to the opinions of the DDS experts. He stated

that the DDS opinions were "balanced, objective, and consistent with the evidence of record as a

whole," and that they were supported by Dr. Bahhur's opinion. The ALJ concluded that "these

experts' familiarity with the SSA disability evaluation program and the evidence of record warrants the greatest weight." R. 21.

As to Dr. Storch's opinion, the ALJ found that even though she had an opportunity to examine Horton in person, her opinion was not supported by objective findings and was inconsistent with other medical evidence of record. He noted that Dr. Storch was a Ph.D., rather than a medical doctor, and that although her specialty was in mental health, parts of her opinion related to Horton's physical impairments. Furthermore, the ALJ stated that Dr. Storch's opinion did not reflect familiarity with the SSA disability program and that she opined on whether Horton was disabled, which is an issue reserved for the Commissioner. As to Dr. Favero's opinion, the ALJ found that although he was a treating physician, his opinion was conclusory, was not supported by objective findings, and adopted Horton's subjective statements without balance or objectivity. As with Dr. Storch, the ALJ also found that Dr. Favero's opinion did not reflect familiarity with the SSA disability program and that it improperly opined on the ultimate issue of disability. R. 22.

An ALJ must consider and evaluate all opinions from "medically acceptable sources," such as doctors, in the case record. 20 C.F.R. § 404.1527. The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency medical consultants. *See id.* § 404.1527(c). A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. § 404.1527(c)(2). An ALJ may reject a treating physician's opinion in whole or in part if there is

"persuasive contrary evidence" in the record. *Hines*, 453 F.3d at 563 n.2; *Mastro*, 270 F.3d at 178.

The ALJ must "give good reasons" for discounting a treating physician's medical opinion. 20 C.F.R. § 404.1527(c). Furthermore, in determining what weight to afford a treating source's opinion, the ALJ must consider all relevant factors, including the relationship between the doctor and the patient, the degree to which the opinion is supported or contradicted by other evidence in the record, and whether the doctor's opinion pertains to his area of specialty. 20 C.F.R. § 404.1527(c). That obligation is satisfied when the ALJ's decision indicates that he considered the required factors. *Burch v. Apfel*, 9 F. App'x 255, 259 (4th Cir. 2001) (per curiam); *see also Vaughn v. Astrue*, No. 4:11cv29, 2012 WL 1267996, at *5 (W.D. Va. Apr. 13, 2012), *adopted by* 2012 WL 1569564 (May 3, 2012). The ALJ must consider the same factors when weighing medical opinions from non-treating sources. 20 C.F.R. § 404.1527(c), (e)(2).

One reason given by the ALJ rings hollow. It was not proper for the ALJ to give less weight to Dr. Storch's and Dr. Favero's opinions on the basis that they were not familiar with the SSA disability program. The regulations state that "the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has" may be a relevant factor in determining the weight to give to a medical opinion. *Id.* § 404.1527(c)(6). This lack of familiarity with disability standards, however, would only be relevant if it "tend[s] to support or contradict the opinion." *Id.* Here, the ALJ provided no support for his conclusion that these medical professionals were unfamiliar with the SSA disability program, and he offered no explanation for why Dr. Storch's and Dr. Favero's supposed lack of familiarity with disability standards made their opinions any less reliable than those of the DDS experts.

The ALJ has, however, provided other reasons, supported by the record, for giving less weight to Dr. Storch's and Dr. Favero's opinions. As to Dr. Storch's opinion, the ALJ correctly noted that Horton's physical impairments and related pain—which Dr. Storch stated would make Horton unable to maintain regular attendance or complete a normal workday—were matters that fell outside of her expertise. In addition, the portions of her report relating to Horton's physical symptoms seem to be entirely based on his subjective reports, rather than any physical examination. As to Dr. Favero, even though he was a treating physician, the ALJ had reasonable grounds to give his opinion less weight. As the ALJ noted, the statements in Dr. Favero's opinion regarding the severity of Horton's symptoms are highly conclusory and unsupported by the objective findings or the longitudinal record as a whole. In fact, Dr. Favero's opinion contradicts his own treatment notes, which typically reflected mild findings. Furthermore, the ALJ correctly found that Dr. Favero's statement that Horton "will have difficulty working now or in the future due to his chronic conditions," R. 364, addressed the ultimate issue of disability, which is reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(1); SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996). For the foregoing reasons, I will not disturb the ALJ's weighing of the opinion evidence.

Furthermore, the ALJ properly determined that Horton could perform light work with various postural and environmental limitations. The ALJ found Horton's credible limitations to be consistent with his treatment records. For example, Dr. Bahhur assessed mostly normal physical findings on examination. Similarly, Dr. Favero and Dr. Kramer conducted physical examinations that revealed mostly unremarkable signs. The ALJ determined that Horton's report of activities of daily living—at least the report he deemed credible—was consistent with the RFC for light work. As discussed above, Horton's activities of daily living are not so limited as to

suggest disability. Additionally, the limitations identified by the ALJ are consistent with the assessments of the DDS experts and Dr. Bahhur. Accordingly, the ALJ's RFC determination is supported by substantial evidence. Furthermore, the ALJ accurately recited this RFC in a hypothetical to the VE. In response the VE opined that Horton could perform work existing in the national economy. R. 55–57. Thus, the ALJ's determination that Horton is not disabled was supported by the evidence before him.

C.    *Newly Submitted Evidence*

Finally, it is necessary to consider whether any of the additional evidence Horton submitted to the Appeals Council warrants reversal or remand. When a claimant appeals an ALJ's ruling, the Appeals Council first makes a procedural decision whether to grant or deny review. *Davis v. Barnhart*, 392 F. Supp. 2d 747, 750 (W.D. Va. 2005). In deciding whether to grant or deny the claimant's request for review, the Appeals Council must consider any additional evidence that is new, material, and related to the period on or before the date of the ALJ's decision. 20 C.F.R. § 404.970(b).

"Evidence is 'new' if it is not duplicative or cumulative, and is material 'if there is a reasonable possibility that the new evidence would have changed the outcome.'" *Davis*, 392 F. Supp. 2d at 750 (quoting *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 95–96 (4th Cir. 1991) (en banc)). Evidence of medical impairments and related symptoms that the ALJ discussed in his opinion necessarily relates to the period on or before the date of the ALJ's decision. *See Wilson v. Colvin*, No. 7:13cv113, 2014 WL 2040108, at *4 (W.D. Va. May 16, 2014). The Appeals Council will grant review "if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently of record," including any additional evidence that it was required to consider. 20 C.F.R. § 404.970(b).

Horton submitted the affidavits and the report of Ms. Seamster to the Appeals Council, which incorporated them into the administrative record before denying his request for review. R. 1–5, 7, 233–38, 368–73. The Appeals Council "considered" this evidence, but found without explanation "that th[e] information [did] not provide a basis for changing the [ALJ's] decision." R. 1–2. Under such circumstances, this Court must review the entire record, including the additional evidence, to determine whether substantial evidence supports the ALJ's underlying factual findings. *Meyer*, 662 F.3d at 704; *Riley v. Apfel*, 88 F. Supp. 2d 572, 577 (W.D. Va. 2000). This can be a difficult task where, as here, the Appeals Council did not explain why the additional evidence did not render the ALJ's "action, findings, or conclusion contrary to the weight of evidence," R. 2, now in the record. *See Riley*, 88 F. Supp. 2d at 579–80.

The Appeals Council is not required to explain how it considered additional evidence or justify its decision to deny the applicant's request for review. *Meyer*, 662 F.3d at 702, 705–06. A federal court reviewing the Commissioner's final decision, however, is not permitted to make factual findings or attempt to reconcile new evidence with conflicting and supporting evidence in the record. *See id*. Courts maintain that balance by reviewing the entire record to determine if there is a "reasonable possibility" that the additional evidence would change the Commissioner's final decision that the applicant is not disabled. *See, e.g.*, *Brown v. Comm'r of Soc. Sec.*, 969 F. Supp. 2d 433, 441 (W.D. Va. 2013). Reversal and remand is required where "the new evidence is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports." *Sherman v. Colvin*, No. 4:13cv20, slip op. at 17 (W.D. Va. June 19, 2014), *adopted by* 2014 WL 3344899, at *1 (July 8, 2014). The same is appropriate where new evidence undermines the ALJ's factual findings and rationale or fills an "evidentiary gap [that] played a role in [the ALJ's] decision to deny benefits." *Meyer*, 662 F.3d at 707; *cf. Jackson v.*

*Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012) (ordering remand where evidence submitted to, but not considered by, the Appeals Council "contradict[ed] both the ALJ's findings and underlying reasoning" for denying Jackson's claim and "reinforced the credibility of Jackson's testimony").

The evidence Horton submitted to the Appeals Council here is neither new nor material. Ms. Seamster's opinion, which was based on a psychological evaluation and Horton's self-described physical ailments, work history, and activities of daily living, is essentially duplicative of (and suffers from the same deficiencies as) Dr. Storch's opinion, which the ALJ found was not entitled to much weight. There is no information in Ms. Seamster's report that had not already been included in the record before the ALJ. Her opinion relies heavily on Horton's subjective descriptions of his symptoms, which the ALJ had properly found to be less than credible. Furthermore, Ms. Seamster, a Licensed Professional Counselor, is not an acceptable medical source under the regulations. 20 C.F.R. § 404.1513(a); *accord Sodders v. Colvin*, No. 6:14cv57, 2016 WL 1065837, at *2 (W.D. Va. Mar. 16, 2016).

Likewise, the affidavits of Horton, his mother, and his father do not present information that is new and material. Their assertsion—that Horton could no longer do chores around the house—had already been presented to the ALJ through Horton and his mother's testimony. The other assertions in the affidavits—that Horton can no longer take care of his pets and can no longer shoot guns and throw knives with both his hands—do not shed any additional light on his condition. Horton's testimony, and that of his mother, described him as nearly immobile and capable of only minimal physical exertion. This necessarily negates the possibility that Horton could hunt or take care of his pets. Furthermore, the ALJ had already found that Horton and his mother were not entirely credible with regard to his symptoms, in part because their testimony

contradicted their earlier statements and the medical evidence. It is therefore not reasonably possible that the affidavits, which further contradict the earlier statements, would have changed the ALJ's determination. Because the additional evidence was not new or material, it does not call into question the evidence or rationale supporting the ALJ's decision.

V. Conclusion

The Court must affirm the Commissioner's final decision that Horton is not disabled if that decision is consistent with the law and supported by substantial evidence in the record. The Commissioner has met both requirements. Accordingly, the Court will **DENY** Horton's motion for summary judgment, ECF No. 12, **GRANT** the Commissioner's motion for summary judgment, ECF No. 14, and **DISMISS** this case from the docket.

The Clerk shall send certified copies of this Memorandum Opinion to all counsel of record.

ENTER: April 6, 2016

Joel C. Hoppe
United States Magistrate Judge